**WESTINGHOUSE ELECTRIC & MFG. CO.
v. RADIO CORPORATION OF
AMERICA.**

No. 1183.

District Court, D. Delaware.

Oct. 6, 1938.

Loyd H. Sutton (of Cameron, Kerkam & Sutton), of Washington, D .C., and Howard Duane, of Wilmington, Del., for plaintiff.

Stephen H. Philbin (of Fish, Richardson & Neave), of New York City, and William G. Mahaffy and Herbert L. Cohen, both of Wilmington, Del., for defendant.

NIELDS, District Judge.

This is a suit in equity "to receive a patent" under Section 4915, U.S.Rev.St., 35

U.S.C.A. § 63. Westinghouse Electric & Manufacturing .Company, plaintiff, is the owner of patent applications by Vladimir K. Zworykin, and Radio Corporation of America, defendant, is the owner of a patent application by Henry Joseph Round.

Zworykin application Serial No.˙683,-337 was filed December 29, 1923. Zworykin application Serial No. 448,834 was filed May 1, 1930. Round application Serial No. 608,324 was filed April 29, 1932, for a reissue of the Round patent No. 1,759,594 issued May 20, 1930, on application filed May 11, 1927. Three interferences were declared in the patent office between Zworykin, Round and other parties who were subsequently eliminated.

Zworykin moved to substitute for his 1930 application his application Serial No. 683,337 filed December 29, 1923. He repeated this motion in each of the three interferences. The examiner of interferences denied his motion in each interference, on the ground that the Zworykin 1923 application, as filed, did not disclose the inventions of the claims in issue. This motion was also denied on the ground that Zworykin's right to the claims in his 1923 application depended upon certain amendments which he had made to the specification but which the examiner held to be departures therefrom.

In the matter of priority, Round relied upon the filing date of his British application May 21, 1926. Zworykin stood on his 1923 filing date. The examiner of interferences awarded priority to Round. The board of appeals affirmed these actions of the examiner of interferences. The present suit was then brought by the plaintiff to obtain the claims denied Zworykin.

Photo-Electric Cell Containing Invention.

The subject matter of this litigation is a method and apparatus for use in television. Zworykin is recognized as the pioneer inventor in television. The system being developed in the United States and Great Britain is called the Zworykin system. In 1919 he came from Russia to this country equipped in science but not correspondingly versed in the nice use of English. December 29, 1923 he filed his first application. That application has been through one interference after another; is still pending in the patent office and is the heart of this controversy.

We do not have to go into the complexities of the electrical transmitting and receiving circuits. The issues in dispute are concerned with only one element ·of the transmitting system, the construction of the photo-electric cell. If in 1923 Zworykin filed an application disclosing a photo-sensitive plate of a specific construction, then Zworykin is entitled to the award of priority. The entire controversy concerns that one question.

It will be necessary briefly to explain the structure of the photo-electric cell. This element is composed of three layers, a rear layer of aluminum foil which is a conductor, an intermediate layer of aluminum oxide which is an insulator, and a front layer of potassium which is photosensitive and in the form of discrete particles. Owing to the surface tension of potassium the discrete particles assume a globular form. The photo-electric material responds to light impinging upon it. The amount of response depends upon the intensity of the light. In a photographic film or plate, effects are obtained because the rays of light from the 'object affect the sensitive material in varying extents, running the whole range from dark to light.

This light affects the photo-electric material but the effect is different. Assuming an object in front of the lens, the quantity of light falling on the respective areas of the potassium layer will of course vary in accordance with the varying intensity of the light reflected from different portions of the object. Each area (or particle) of the potassium will then emit electrons in proportion to the amount of "tone value" of the light falling thereon. As electrons are negative charges of electricity, each area of potassium will thereby become positively charged to an amount which is proportional to the number of electrons lost, and therefore also in direct proportion to the tone value of· the light falling thereon. Hence there is a difference between the positive charges on the various potassium areas which is in exact accordance with the variations in light which make visible the object being viewed. As each potassium area is separated from the aluminum foil by insulating material (aluminum oxide), each potassium area forms one element of a condenser, and the quantity of charge in each condenser is in direct proportion to the quantity of light falling on the corresponding area of potassium. If these numerous condensers are now connected in sequence into a circuit, the current flowing in the circuit will obviously

vary in accordance with the successive charges of the respective condensers as they are brought into the circuit in sequence.

But this circuit is not complete because of the presence of the aluminum oxide insulator in each of the numerous condenser cells. Means are accordingly provided whereby the potassium and aluminum of these cells are electrically connected in sequence through the aluminum oxide. In order that persistence of vision may be obtained, all of these numerous cells must be sequentially brought into the circuit in less than one-sixteenth of a second. As in motion picture projection, the illusion of motion is caused because successive pictures are thrown onto the screen at a rate which exceeds sixteen to the second, because the human eye can not distinguish between different views appearing one after the other at so rapid a rate. To avoid mechanically moving parts Zworykin has provided a very rapidly moving cathode-ray beam, known as a scanning ray, which moves across the photo-electric element to pierce the aluminum oxide and bring all of the numerous cells in sequence into the circuit in a thirty-second of a second.

As the cathode ray is composed of electrons or negative charges of electricity, and as at each point of impingement of the cathode ray on the aluminum it penetrates not only the aluminum but also the aluminum oxide, the potassium of each cell, as its aluminum oxide insulation is penetrated, is thus brought into circuit with the aluminum, discharging that particular cell. Thus as the ray scans the photo-electric element it passes from cell to cell, connecting each cell in sequence into the circuit, and thereby varying or "modulating" the current that is sent out through the amplifying system to the antenna in accordance with the charges on the respective cells. Hence the current going to the antenna is a continuously varying current that changes from instant to instant in accordance with the charges on the respective cells sequentially connected into the circuit by the scanning ray. This phenomonon is taken advantage of as a means of varying or modulating the radio waves sent out by the antenna.

The physical condition of the potassium surface is a matter of critical importance. If this surface were a continuous layer of potassium, so that every part were in conductive relationship with every other part, it would not matter where the beam penetrated. The entire face of the plate would be connected up with the entire rear face of the plate and the differential in photo-electric effect over the various portions of the face of the plate would be lost. On the other hand, if this potassium is composed of separated parts or discrete particles, then each particle is out of contact with every other particle. The positive charge induced by loss of electrons will be retained until the beam pierces that particular spot and produces an impulse current in proportion to that particular charge. The separation of the potassium into little globules is produced by distilling the potassium so that it condenses into globules. Thus the potassium layer is made up of a great number of discrete particles which are separated from each other.

### Question Involved.

The fundamental question is whether Zworykin or Round is the first inventor of a potassium layer with discrete particles or elemental areas. The patent office awarded priority to Round because his application which was filed May 11, 1927 is entitled under Sec. 4887, U.S.Rev.St., 35 U.S.C.A. § 32, to the filing date of his British application, i. e. May 21, 1926.

Zworykin asserts he is the first inventor because everything defined in the claims in suit was disclosed in his application Serial No. 683,337 filed December 29, 1923. He moved to substitute his 1923 application for his 1930 application immediately involved. It is assumed throughout this case that if the claims in issue are readable upon the Zworykin 1923 application, Zworykin is entitled to the award of priority. The claims in issue define the potassium of the photo-electric element as being in the form of elemental areas. The only question in controversy is whether potassium in the form of elemental areas, or the like, is new matter in Zworykin's 1923 application. If it is not new matter, Zworykin is entitled to make the claims in issue in his 1923 application and Zworykin is the first inventor.

### The 1923 Application.

Did Zworykin disclose potassium in the form of elemental areas or discrete particles in his 1923 application? In his application as filed on December 29, 1923 Zworykin described his photo-electric element in the following language: "The plate 32 is constructed of a thin sheet of

aluminum foil 34 which may be about .0001 micrometers in thickness, upon which is placed a layer of aluminum oxide, the thickness of which may be about .0003 micrometers. Upon this is placed a layer of alkali metal 36 which may be potassium hydroxide, or other photoelectric material".

The term "potassium hydroxide" was obviously a typographical error for "potassium hydride" and in using the term "micrometers" Zworykin obviously meant "millimeters". No one questions the propriety of Zworykin's corrections of these terms. The law examiner rejected some of the claims as too broad in view of the prior art. In responding, Zworykin voluntarily revised his description and referred to the potassium as in the form of "small globules, each of which, to all intents and purposes, is a minute photoelectric cell". He amplified the explanation of operation to state that the current flowing in the circuit was "dependent upon the electron emission from the globule or globules of photoelectric material". These amendments were made before Round's earliest date of invention.

Doubtless the original disclosure was sufficient to teach one skilled in the art the structure of the photo-electric element. If there was any ambiguity or lack of clarity in the original statement it was Zworykin's duty under section 4888 of the Revised Statutes, 35 U.S.C.A. § 33, to amplify or restate the descriptive matter so as to make his explanation clear and complete. The law examiner accepted this restatement without question or criticism. He saw no new matter in the restatement.

The law examiner rejected other claims on prior art and Zworykin voluntarily rewrote the amended portions. The subject matter is restated with greater clearness. There was no amplification of disclosure as to the potassium layer and this disclosure has not been changed since the date of the amendment. Here the examiner accepted the restatement as proper and raised no question of new matter.

Early Interferences.

Zworykin's 1923 application was placed in a series of interferences. Zworykin was the senior party and presumably the first inventor.

The issue in the first interference No. 54,922 was a method claim which included "a member whose resistance varies with the illumination thereof"—the potassium, and a scanning cathode ray "producing current variations in accordance with the resistance of successive elemental areas of the member". The examiner would not have set up this interference requiring "successive elemental areas" unless he had understood Zworykin disclosed "successive elemental areas" in his application as filed.

The issue in the second interference No. 54,923 in addition to the photo-electric element or screen included "means between the faces [of the screen] for establishing conduction transverse to the screen at each point while the cathode ray acts at said point and preventing conduction at other times".

The issue in the third interference No. 55,448, included "a resistance element, whose resistance varies with its illumination" and "a movable cathode ray for including in an electric circuit successive small areas of said element."

The issue in the fourth interference No. 57,145, included two claims which involve the same principles of operation.

The four interferences were consolidated into interference No. 54,922 and considered together. All Zworykin's opponents were men skilled in the art. Five saw nothing by way of new matter in Zworykin's amendments to his specification. However, one of these opponents raised the issue of new matter. He moved to dismiss in each of the first three interferences on the ground that Zworykin's device as originally disclosed "was not operative or if operative it was so because of the presence of new matter". When required to amplify this charge of new matter the opponent pointed to the amendment characterizing the potassium as in globular form. In denying the motion to dissolve the law examiner ruled: "The changes made in Zworykin's specification do not introduce additional structure and are not such departures from the original disclosure as to justify rejection of the count in Zworykin's case on the ground that it is based on new matter."

This opponent appealed to the board of appeals. The board held Zworykin's device operative, ruling: "This same conclusion reached by us applies to the allegation of the appellant that Zworykin's original specification and drawings constituted an insufficient disclosure. The examiner regarded the additional explanation as within the original disclosure and after a care-

ful consideration of the record we see no reason to reach any other conclusion."

This opponent then appealed to the court of customs and patent appeals urging inoperativeness and insufficient disclosure. The court affirmed the patent office. It recited the proceedings respecting the charge of new matter and noted that no appeal was prosecuted therefrom. It took no exception to the ruling "that the application contained a sufficient disclosure to support the issue claims, with limitations to 'elemental areas'". The court found that the issue claims were supported by Zworykin's disclosure.

### Another Early Interference.

November 4, 1930 Reynolds patent No. 1,780,364 was granted. This grant occurred during the pendency of consolidated interference No. 54,922 above detailed. February 8, 1932 after the decision of the Court of Customs and Patent Appeals Zworykin copied Reynolds' claim No. 1. Thereupon interference No. 64,026 of Reynolds v. Zworykin was declared. Reynolds moved to dissolve the interference. Reynolds urged that Zworykin initiated the flow of current by the emission of electrons from his photo-electric globules, while Reynolds impeded the current by the space charges. Also Reynolds said the claim was copied from an issued patent and should be construed narrowly so as to exclude Zworykin.

For some unexplained reason the examiner of interferences not only upheld Reynolds but also injected the issue of new matter, sua sponte, without any record, briefs or arguments before him on this issue. He dissolved the interference. Zworykin then appealed to the board of appeals. The board of appeals in its decision went beyond the examiner of interferences and affirmed on the ground of new matter. The decisions in the first group of interferences were before these tribunals. Zworykin contended that the decision in the first group of interferences made the issue of the instant interference res judicata. However, neither the examiner nor the board attempted to distinguish or explain the decisions in the earlier interferences nor did they attempt to explain how Zworykin's device could possibly work if the potassium was not in the form of discrete particles or globules. The decision dissolved this interference.

### Interferences Here Involved.

May 1, 1930 Zworykin filed his application Serial No. 448,834 which carried over a disclosure of the same method and system involved in his 1923 application. In addition, he disclosed certain improvements such as causing the scanning ray to return from its final to its initial position at a greater speed and to be weakened during such return movement. Claims to the basic method and system of Zworykin's 1923 application could properly be applied to this new application of 1930. While Zworykin's 1923 application was still involved in consolidated interference No. 54,922, this 1930 application was added to the then pending interference between Matthes and Jenkins No. 60.779 which had been running for some time. The inclusion of the 1930 application on counts which would read on either the 1923 or the 1930 application was sound practice, because the applicant could move to substitute his earlier case. Later the Round application was added to this interference. A second interference No. 62,-721 was set up between Jenkins and Zworykin. Round was afterwards added. A third interference, No. 67,440, between Zworykin Matthes and Round arose from motions in interference No. 60,779.

After the Court of Customs and Patent Appeals had decided interference No. 54,-922 in favor of Zworykin he moved to substitute his 1923 application in this new group of interferences. He pointed out how the issue counts read clearly on his 1923 application.

The principal proceedings in this later group occurred in interference No. 60,779 because it involved all four of the parties. It was in the interest of the opponents of Zworykin to oppose the substitution of the 1923 application on the ground that Zworykin could not make the claims because they defined new matter. None did oppose on that ground. Jenkins saw nothing by way of new matter in Zworykin's amendments. Round did not oppose the motion. Matthes called attention to the decision of the board of appeals in interference No. 64,026 affirming the decision of the examiner of interferences dissolving that interference.

The examiner of interferences in dealing with interference No. 60,779 apparently felt bound by the decision of the board of appeals in interference No. 64,026. He denied the motion to substitute **on the**

ground of new matter. A like decision was entered in interference No. 62,721 and these rulings controlled the declaration of interference No. 67,440.

Zworykin then appealed from the decision of the examiner of interferences to the board of appeals. Jenkins and Round did not oppose. Matthes repeated the statement he had filed below. The board of appeals adhered to its decision in interference No. 64,026 and amplified its ruling on rehearing. The proceedings in the other two interferences were suspended during this appeal. In interference No. 62,721 a petition for rehearing was denied. In this petition the impropriety of going contrary to the decisions in the earlier group of interferences was urged. This provoked the statement from the examiner that no one was attacking the operativeness of the Zworykin device.

In this later interference Zworykin made his record solely on his right to substitute his 1923 application. Upon Round's motion the examiner of interferences entered an award of priority in favor of Round in each of the three interferences. Matthes and Jenkins were dropped. Zworykin took an appeal in each of the three cases. The board of appeals adhered to its former conclusion in each case and repeated the decision upon rehearing. Thereupon the present suit was instituted.

### Claims Here In Issue.

The fourteen claims in the three later interferences are also claims in Zworykin's 1923 application. These claims as well as the amended specification are supported by a supplemental oath.

Incidentally it should be observed that no one has criticised the right of Zworykin to make each and all of these claims in his 1923 application, except as to the form in which the potassium exists, i. e. in the form of elemental areas or the like. No decision of any officer or tribunal of the patent office has discussed any of the other limitations of these claims. Each decision has assumed that these claims are all properly applicable to Zworykin's 1923 disclosure, except this one limitation.

Count 1 of later interference No. 60,779 calls for "energizing a light sensitive device in accordance with the characteristics of an elemental area of a visual representation". Count 2 calls for "translating the characteristics of the elemental areas of the representation into electrostatic charges".

The above language is similar to the language used in the counts of earlier interference No. 54,922. There we find "producing current variations in accordance with the resistance of successive elemental areas of the (image-receiving) member" or "successive small areas" thereof. In the earlier group of interferences the patent office held this language did not involve new matter. In the later or present series of interferences these "elemental areas" have been held to involve new matter. Here is a flat contradiction. In both instances "elemental areas" means the existence of potassium in the form of discrete particles or globules so that they shall be individually responsive to the intensity of the light falling thereon.

Count 1 of later interference No. 62,-721 calls for "a plurality of light-current transmitting devices, an impulse storing element in circuit with each devise." Count 2 uses much the same language except that the transmitting devices are characterized as "light-sensitive cells". Counts 3 to 7 refer to the "elementary areas", variously characterized as "electrically-separated", "light sensitive", etc. Counts 8 to 10 use broader language in calling for a "plurality of light sensitive devices". In every instance the reference is to the potassium in the form of separate areas or discrete particles.

The single count of later interference No. 67,440 calls for a bank of condenser elements and means for charging the same "in accordance with the tone values of different elemental areas". Here again is a reference to the potassium in the form of separate areas or discrete particles.

If the patent office in the earlier group of interferences was right in holding that Zworykin in his 1923 application disclosed a light sensitive element in the form of elemental areas, these fourteen claims variously calling for the light sensitive element to be in the form of elemental areas (or broader expressions) must also correctly apply to Zworykin's 1923 disclosure as filed.

### Record in the Patent Office.

Zworykin elected to rely on his 1923 filing date for each of the claims in issue. To this end he filed affidavits by Dr. Langmuir, Dr. Dushman, Dr. Kunz, Professor Tykociner and Mr. Iams as to what was the necessary meaning of Zworykin's original disclosure. He also filed an Iams affidavit

showing that a device had been built strictly in accordance with the disclosure of the 1923 application and that it worked as described therein and could only work if the potassium were in the form of elemental areas or discrete particles. A stipulation was filed and accepted by the patent office that these affidavits should be taken as if the statements therein had been made in regularly taken depositions.

### New Evidence.

The case before this court is predicated very largely upon new evidence although in some respects by way of amplification and clarification of evidence before the patent office. The new evidence was necessitated by holdings of the board as to what further evidence it considered necessary to rebut the charge of new matter. This new evidence includes:

(1) The board of appeals in its last decision found that "We fail to find any definite statement that the only way to deposit a layer of photoelectric material on an aluminum oxide surface is by a process of distillation which would necessarily produce a discontinuous surface of disconnected globules".

A "definite statement" is now produced through several witnesses. Strobel's exhaustive investigation as to available procedure and Nathanson's experiments show that this alone is possible with known procedures. The witnesses establish that the only available procedure consistent with Zworykin's disclosure necessarily produced discrete particles in forming the potassium layer and that such was universally known to be the case prior to 1923.

(2) The board questioned the ability of the witnesses to remember what was their knowledge in 1923. The accuracy of their statements is now established by new evidence from their own writings and readings. Also through Strobel's investigation it is shown that their recollection accorded with the widespread knowledge of the art prior to 1923.

(3) The board's decisions involve mistakes of fact in their interpretation of prior patents, publications and affidavits. These errors have been corrected by new evidence.

(4) New evidence by Dr. Nathanson, Professor Tykociner and Strobel shows that Zworykin's device, as disclosed in his 1923 application, can operate in only one way and that way was exactly described in his 1923 application as filed. Further, that there was only one way known for forming the potassium element disclosed by Zworykin in 1923 and that way necessitated the deposit of the potassium in the form of elemental areas, discrete particles or globules.

(5) Supplemental affidavits were offered in evidence at the trial by each of the affiants before the patent office wherein the affiants take up the mistakes made by the board in interpreting the earlier affidavits. They amplify and clarify their earlier statements. Professor Tykociner was called as a witness at the trial and reiterated all the statements of his affidavit and dealt with further matters.

The new evidence before this court is in large part the additional evidence called for by the board. It removes doubt as to what was the knowledge of the art in 1923. It corrected the mistakes into which the board fell through lack of familiarity with the art.

■ This new evidence is sufficient to carry thorough conviction that the patent office erred in awarding priority to Round. This is not evidence suppressed or deliberately withheld from the patent office but new evidence necessitated by the decisions in the patent office. Plaintiff has thus met the burden by introducing new evidence different from anything that was before the patent office and which carries thorough conviction that the patent office erred in denying Zworykin the award of priority. Morgan v. Daniels, 153 U.S. 120, 14 S.Ct. 772, 38 L.Ed. 657; American Tri-Ergon Corporation v. General Talking Pictures Corporation, D.C., 8 F.Supp. 108, 121.

### Findings of Fact and Conclusions of Law.

■ 1. Zworykin's 1923 disclosure as filed was adequate.

Section 4888, U.S.Rev.St., 35 U.S.C.A. § 33, requires that an applicant for a patent so disclose his invention "as to enable any person skilled in the art or science to which it appertains, or with which it is most nearly connected, to make, construct, compound, and use the same."

The present invention is concerned with the use of photoelectricity in modulating radio waves for television. The art of photoelectricity is very old. There is a wealth of information in technical papers establishing that before 1923 it had been fully appreciated that the only way known for making such a photo-electric element, as disclosed by Zworykin in his 1923 ap-

plication, was by the process of depositing the potassium from a vapor, and that the potassium when deposited could only exist in the form of separate or discrete particles or globules. It is impossible to obtain continuity in the deposit because of the tendency of potassium to agglomerate into larger and larger globs until they run off the surface like mercury off a table top. To one skilled in the art in 1923 the expression "layer of potassium" in a photo-electric cell could only mean a layer composed of discrete particles or globules of potassium.

What is old in the art is implied in the disclosure.

"He may begin at the point where his invention begins, and describe what he has made that is new, and what it replaces of the old. That which is common and well known is as if it were written out in the patent and delineated in the drawings." Webster Loom Company v. Higgins, 105 U. S. 580, 586, 26 L.Ed. 1177.

It was therefore unnecessary for Zworykin to state in his application, as filed on December 29, 1923, what was so well known in the art at that date as the only form in which the potassium could exist in such a photo-electric element. One skilled in the art would have understood that very thing from Zworykin's statement that his photo-electric surface was composed of a "layer of potassium".

While Zworykin is recognized as a pioneer in television, photo-electric cells using potassium had been known long prior to 1923. Photo-electric cells using potassium were on the market in 1923 and were made by depositing potassium in the form of discrete particles. It had been recognized that in the transmission of pictures by wire the photo-electric surface must be in the form of elemental areas or discrete particles. This was knowledge widely distributed prior to 1923 and fully appreciated in the photo-electric art to which Zworykin's original specification was directed.

2. The amendments made by Zworykin in his 1923 application did not involve new matter.

No amendment of the Zworykin 1923 specification was necessary. If Zworykin had not amended his specification he would have been entitled to make, in his 1923 application, each and all of the claims here in controversy. He has not lost his right to make these claims because of his amendments, because the amendments can be cancelled and the specification restored to the form in which it was filed in 1923.

In fact, the amendments which Zworykin made to his specification were proper amendments. If there was any respect in which his original description was obscure or incomplete, it was his duty to amplify his description. When Zworykin stated, in his amendment A and then restated in his amendment B, that the potassium existed in the form of globules or discrete particles he merely said what one skilled in the art would necessarily understand to be meant by the original description. The amendments were conducive to a clear understanding of why the cathode ray as it moved from point to point on the potassium would modulate or vary the electric current.

Such a restatement or explanation is not new matter. Robinson on Patents:

§ 561. "* * * Amendments in substance can be made only within certain limits, and under certain prescribed conditions. No new matter can under any circumstances be introduced by amendment. New matter is that which is not found in the specification, drawings, or model, as first filed, and which involves a departure from the original invention. Such matter must necessarily be a distinct art or instrument, or a new and separately patentable improvement on the old, and can be now presented only in a separate application."

§ 635. "* * * The scope of the amending power is limited to such alterations of description and assertion as do not affect the essential character of the invention or the person of the patentee. For a mistake in these the only remedy is by the issue of a new original patent upon an independent application."

"The rule is that insertions by way of amendment in the description or drawing, or both, do not hurt the patent, if the insertions are only in amplification and explanation of what was already reasonably indicated to be within the invention for which protection was sought—'something that might be fairly deduced from the original application'." General Electric Co. v. Cooper Hewitt Electric Co., 6 Cir., 249 F. 61, 64.

Zworykin in his 1923 application explained precisely how his device worked. It could work only if the potassium existed in the form of elemental areas or discrete

particles. As fully explained by Dr. Nathanson, Mr. Strobel and Professor Tykociner at the trial, there is only one way in which such a photo-electric device could have been made in 1923, or now, and that is by depositing the potassium in the form of discrete particles which can not be made to unite into a continuous layer. All of this was perfectly well understood in the art prior to 1923.

3. Zworykin's application as filed in 1923 contained a disclosure of operation that could mean only one thing.

Zworykin's 1923 application described and claimed his method and system in a way that required the presence of the potassium in the form of elemental areas or discrete particles. Zworykin pointed out that upon focusing the light from the image "upon the photoelectric material 36 of the composite plate 32, electron emission of varying intensity by this substance takes place in accordance with the light from the object placed before the lens 37".

He said that the output of his amplifier was modulated in accordance with the current in the amplified triode 12, and the latter in turn "is governed by the intensity of the light focused upon the particular spot at which the cathode ray is located. The intensity of this electron stream is, of course, governed by the intensity of the light from the object."

In describing the manner of operation he said: "As the cathode beam traverses the surface of the composite plate 32 point by point in a definite sequence, there is a current flowing from the grid 39 and the aluminum foil 34 at each particular point, and this current is directly proportional to the intensity of light from the object to be observed. Thus, the oscillatory current generated by the oscillator triode 9 is modulated in accordance with the light from each portion of the image".

Modulation "in accordance with the intensity of the light falling upon that particular point" is again emphasized on page 20, and near the bottom of the page he said "for every particular point on the image, the carrier current radiated by the antenna 3 is modulated".

His claims as originally filed in 1923 also required potassium in the form of separated areas. Claim 6, in its "means for controlling said two sources of high frequency current in accordance with the light from various portions of said object";

claim 8 in its "means controlled by the cathode ray * * * for modulating said first high-frequency current in accordance with the intensity of light at various portions of the object"; claim 11 in its "means including the cathode beams for reproducing in certain sequence the various points of the image of the object on said transmission screen"; and claim 12 in its similar language of the last clause. All mean and can only mean that the potassium must be in the form of separated areas which are scanned in a definite sequence by a moving cathode ray so as to modulate the current in accordance with the varying charges on these various potassium areas. The cathode ray could not modulate current in accordance with the various portions or points of the image unless the image plane was composed of separate particles or areas.

4. Zworykin's device as disclosed in his 1923 application as filed could operate in only one way.

Dr. Nathanson and Professor Tykociner have pointed out in detail why it is necessary for the Zworykin layer to be in the form of elemental areas or discrete particles if the device is to work as described. They point out that if the potassium were in a continuous layer it would be in conductive relationship throughout. Therefore, the photo-electric effect produced at different portions of its surface, by the varying intensity of the light from various portions of the view being televized, would tend to run together and assume an average. It would make no difference where the cathode ray pierced the layer 32. Wherever it pierced this element it would tap the total charge on the entire potassium layer. Hence as the scanning ray moved back and forth there would be no variation in or modulation of the current as respects different portions of the view, but only a "uniform smear". At every point the ray would be in conductive relationship with the entire potassium surface. The current set up would be the total effect of the light on the entire potassium surface without any possible differentiation between the various portions of the view. The movement of the scanning ray would be useless. Movement of the scanning ray is for the purpose of bringing the ray into contact with the different elemental areas. If they were already all in contact there would be nothing accomplished by moving the ray from point to point.

The original Zworykin specification and claims of 1923 contained repeated references to this manner of operation, and any one skilled in the art would have known that the Zworykin device must have its potassium in the form of elemental areas, and could only operate if the potassium were so formed. This is also shown in the new affidavits of Langmuir, Kunz and Tykociner.

5. There was only one way by which the potassium photo-electric element of Zworykin's 1923 application could have been made.

This is the main question about which the four decisions of the board revolved. In the first decision it noted that "the layer of alkali metal 36 as described in the specification must necessarily be deposited in the form of droplets or globules". The board said it was "not convinced" that it would be "necessarily" so formed. It reached the erroneous conclusion that globules were not "necessarily inherent in such a layer of alkali metal". On rehearing the board said it was "not convinced" this would always be true. It reached the conclusion that Zworykin's disclosure did not necessarily preclude a layer thick enough to be continuous. While recognizing that potassium tended to form as "isolated globules" the board said it would also "probably" be true that under proper conditions "a number of isolated globules would not form".

In the next decision the board questioned the ability of the witnesses to remember what they knew in 1923. After discussing Dr. Langmuir's statement that distillation was the "commonly known and used method" the board reached the erroneous conclusion that "it was evidently not the only method". Finally, in its last decision the board stated what it considered to be the deficiency in the evidence before it: "We fail to find any definite statement that the only way to deposit a layer of photo-electric material on an aluminum oxide surface is by a process of distillation which would necessarily produce a discontinuous surface of disconnected globules."

Thus a definite criterion was finally laid down by the board. This criterion has now been definitely and categorically met by the new evidence before this Court. The only way for depositing a layer of potassium as disclosed by Zworykin was, and is, the process of distillation. This process necessarily and inevitably produces a discontinuous surface of disconnected globules. This is still true today. There are only two ways by which a photo-electric surface can be formed, (1) casting and (2) distillation. Casting of necessity requires the formation of a relatively thick layer because the potassium has to be melted and poured while inside of an evacuated tube. It would be impossible to cast a layer as thin as indicated by Zworykin's original disclosure. In view of the tendency of potassium to run off a surface like mercury, the element disclosed by Zworykin, unless modified in structure, could not retain the potassium even if it could be made strong enough to withstand the casting procedure. Casting had been superseded by distillation long before 1923. The only way in which such a structure as originally described by Zworykin could be made in 1923 was by distillation. Such a procedure necessarily and inherently involved a deposit in the form of discrete particles or globules, and this was well known in the art in 1923 and long prior thereto.

Nor could the deposition be continued so as to form the potassium into a continuous layer. This is implicit in the high surface tension of potassium. To demonstrate this for the information of the court, Dr. Nathanson ran a series of experiments and tried to form a continuous layer both on vertical and on horizontal surfaces. He demonstrated that it is impossible to form on a flat surface, as disclosed by Zworykin, a continuous layer of potassium that can be used for photo-electric purposes. If the distillation is continued for long periods some of the globules run together and form large aggregates, and when these aggregates get too large they run off of the surface, whether the surface is vertical or horizontal.

The only known way by which a continuous layer of potassium can be so formed is by retaining the surface on which the deposit is forming at the temperature of liquid air, i. e., 325° below zero Fahrenheit. Such procedure could not be used in forming the Zworykin element 32 because it would require a container for liquid air at the back of the plate, and this would render the device inoperative because it would prevent the cathode ray reaching the plate 32. Moreover, the photo-electric cell would have to be at all times maintained at the temperature of liquid air, whether in oper-

ation or not, or else as soon as it warmed up to room temperature it would break up into minute globules.

The art understood in 1923 that the photo-electric effect was essentially a surface effect. The only portion of the potassium that performs any function is the surface layer of molecules, and therefore, there would be no need for more than such a thin layer of potassium as would naturally form by distillation.

The art abundantly understood in 1923, from its work on transmitting pictures by wire, that the photo-electric surface must be composed of separate or elemental areas if the different elements of the picture were to be transmitted. The board speculated that it might be possible to continue deposition until the layer was continuous. This is now shown to be an impossibility with such a structure as disclosed by Zworykin.

Anyone skilled in the art in 1923 would have understood Zworykin's disclosure as calling for a potassium element formed by distillation which "would necessarily produce a discontinuous surface of disconnected globules". For the board of appeals to speculate that Zworykin might have meant a continued deposition until a thick continuous stratum of potassium was established is assuming (1) that Zworykin was so ignorant of the knowledge in the art that he would do what was useless, i. e., form a thick layer when only the surface would be effective; (2) that he was so ignorant of the principle underlying his invention that he would follow this useless procedure to the extent of rendering his device inoperative, and (3) that he was so ignorant of physical principles as to attempt to do the impossible with such a structure as he disclosed. The new evidence has established that the board's assumptions are without foundation in fact.

6. The conclusions of the board were predicated on a misapprehension and misconstruction of the record.

Langmuir, Dushman, Kunz and Tykociner, plaintiff's experts, supplemented their statements before the patent office and pointed out wherein the board misinterpreted their earlier affidavits. It is unnecessary to go through the board's decisions and point out the mistakes which it made. It may suffice to indicate a few errors which manifest the board's unfamiliarity with the art and their misinterpretation and misunderstanding of the statements before it.

For example, Zworykin in his patent No. 1,691,324 referred to the photo-electric material as "evaporated on the aluminum oxide, or other insulating medium, and treated so as to form a colloidal deposit of potassium hydride consisting of minute globules."

The board erroneously seized on this statement as meaning that some treatment of the deposit was necessary in order to produce globules. The treatment with hydrogen to form hydride has nothing whatever to do with the existence of globules. The potassium is already in the form of globules. That is the only way in which it can be deposited. It is afterwards treated with hydrogen.

Again, the board seized a statement made in 1933 by Zworykin to the effect that there was "a multitude of methods" of making "the mosaic". This was misconstrued as meaning that there was a multitude of ways in which the potassium could be deposited in forming the mosaic. That there was a multitude of ways for forming mosaics has been shown. But there was the single way of distilling the photo-electric material in the form of globules or discrete particles.

Again, the board doubted whether at the date of testifying the witnesses knew the state of their knowledge in 1923. This has been established by showing what was the published art in 1923. Strobel's testimony showed the widespread knowledge of the art prior to 1923. The new affidavits explained in detail how the affiants fixed their knowledge as of 1923.

Again, the board misunderstood Kunz' patent for providing a conductive backing for the film of potassium droplets. Dr. Kunz shows that the potassium layer is composed of separate particles and that it is necessary to provide a conductive backing layer if lateral conduction is desired. This was well known in the art long prior to 1923. If the potassium itself were a continuous layer it would be conductive and the backing layer of silver would be superfluous.

Again, the board took the statements by the affiants as implying that there were other ways available in producing photoelectric cells. These statements have been explained by the new evidence and the

errors of interpretation pointed out in the new affidavits.

There was also some intimation in the board's earlier decisions that the word "layer" implied a non-globular structure. The new evidence explains that the term "layer" in this art does not import continuity as opposed to globules.

7. Zworykin's priority is also proved by his patent No. 1,691,324.

There is a third Zworykin application which was not in the interferences. It was overlooked in the patent office but is of decisive importance. This application filed July 13, 1925 matured into Zworykin's patent No. 1,691,324 and expressly disclosed the exact photo-electric cell of Zworykin's 1923 application. The disclosure of this application was a copy of the 1923 application except that it added three color screens at the transmitting and receiving stations so that the views would be transmitted in natural colors rather than black and white.

Respecting this patent plaintiff's expert, Nathanson testified:

"Q169. Will you please state in what respect the disclosure of this patent differs from the disclosure of the original Zworykin application of 1923, just very briefly to inform his Honor as to the two different cases?

"A. I should say that the disclosure for this patent is identical with that of the Zworykin 1923 with just this exception, namely, that in this patent that was granted to Zworykin, he introduced a three-color filter in front of the lens of the transmitting tube, which color filter on Figure 1 is designated as No. 40, and on the next sheet, Figure 2, at the receiving station, there is also a 3-color filter designated as No. 64.

"The object of this invention is to transmit by television images of objects in their natural color. So far as the remainder of the device is concerned, to me it seems identical with that of the original Zworykin application.

"Q170. In making that statement, have you included the particular construction and manner of operation of the photo-cell at the transmitting station?

"A. Yes, sir, I have. The device as shown by Figure 1 is identical with the diagram as shown on this card, with the exception that the color screen 40 is introduced, but so far as the electrical part of the apparatus, it is identical."

As pointed out by Dr. Nathanson every one of the 14 claims here in controversy read on this Zworykin patent. This has never been questioned or denied. It has been expressly asserted by the patent office. After the award of priority in favor of Round all of these 14 claims won by Round were rejected in the Round application because they were met by this Zworykin patent. The record places beyond a doubt that every one of the 14 claims here in issue reads clearly on Zworykin's application as filed on July 13, 1925. This date is nearly a year ahead of any date that can be accorded to Round. Round's earliest date is May 21, 1926. Therefore Zworykin is the first inventor for this additional reason.

■ 8. Defendant admitted all of the allegations of the bill. It did not contest the issue of priority between Zworykin and Round. It stated at the trial that it had certain license rights under any patent that might be granted on this Zworykin application. In view of the common interest between plaintiff and defendant, due notice of the institution and trial of this suit was given to the Commissioner of Patents but no appearance was made in his behalf. "The fact that there is no adverse interest of record does not deprive the inventor of the benefit of the statute." Schmertz Wire-Glass Co. v. Pittsburgh Plate-Glass Co., C.C., 168 F. 73, 87.

### Conclusion.

A decree will be entered awarding priority to Zworykin and authorizing the Commissioner of Patents to allow the 14 claims in controversy in Zworykin's 1923 application.

This opinion contains a statement of the essential facts and of the law applicable thereto in conformity with Equity Rule 70½, 28 U.S.C.A. following section 723.