144.

JOHN B. PIERCE FOUNDATION et al. v. PENBERTHY INJECTOR CO.

No. 1231.

District Court, D. Delaware.

March 29, 1941.

Henry J. Lucke and Andrew G. Hubbard, both of New York City, and Hugh M. Morris and Alexander L. Nichols, both of Wilmington, Del., for plaintiffs.

Charles W. Hills, Jr., and Benjamin H. Sherman, (of the firm of Charles W. Hills), both of Chicago, Ill., and Herbert L. Cohen, of Wilmington, Del., for defendant.

NIELDS, District Judge.

This is a suit in equity under section 4915, U.S.R.S., 35 U.S.C.A. § 63, growing out of an interference in the Patent Office between William C. Groeniger, assignor to plaintiff corporation, and Howard L. Yoder, assignor to defendant corporation. The Patent Office found Yoder to be the first inventor and refused a patent to Groeniger who thereupon brought this suit.

The invention is for use in the supply line of plumbing fixtures. Under normal conditions it permits a flow of water into the fixtures whenever the flow is released from the supply line. Under abnormal conditions causing a substantial drop of pressure in the supply line, the invention prevents back flow of water from the plumbing fixtures into the piping supplying the building with water for domestic consumption.

The Interference was declared September 17, 1935, between the application of William C. Groeniger, Serial No. 24,476 filed June 7, 1935, and an application originally filed as the joint invention of Howard D. Yoder and Frederick Cameron Bryam, Serial No. 9,269 filed March 5, 1935. Early in the interference proceeding Bryam filed a disclaimer and the proceeding was reformed as one between Groeniger and Yoder as sole inventors of the subject matter in issue. In the Patent Office Groeniger took testimony but Yoder did not. Yoder relied on his filing date as the date of his conception and constructive reduction to practice.

The counts in issue read:

"Count 1. In an improved automatic self-policing air valve and back pressure control device, the combination of a valve body, a chamber therein, a diaphragm valve located in said chamber, a normally closed self-closing opening in said diaphragm valve and arranged to permit passage of fluid from the inlet through the chamber, and said normally closed self-closing opening automatically closing on the reduction pressure in the passage to prevent return of fluid to the inlet passage.

"Count 2. In a device of the class described, means providing a chamber having fluid inlet and outlet and an air inlet, a diaphragm within said chamber movable responsively to pressure differentials therein, said diaphragm carrying means providing a choke orifice, the parts being so arranged that pressure flow through said chamber closes communication between said air inlet and said fluid inlet and outlet and abnormal drop in pressure opens communication with said air inlet and chokes back flow through said orifice."

Groeniger had devoted many years to the plumbing industry. He had published numerous papers in connection with the problem of back siphonage and ways in which it could be prevented. He was fully acquainted with conditions under which it occurs in plumbing installations. In 1927, as chairman of the Research Committee of the American Society of Sanitary Engineering, Groeniger presented papers calling attention to the dangers to public health arising therefrom. Both Groeniger and Yoder knew of the disastrous outbreak of amoebic dysentery in a Chicago Hotel during the Chicago World's Fair in 1933. This incident afforded an incentive to both of them to develop devices capable of pre-

venting back siphonage in plumbing systems. Publications in evidence show that where there is a drop of pressure following a break in a water main there will be a back flow of contaminated water from the toilet bowl.

In May, 1930, Groeniger obtained from a valve manufacturer certain valves to be placed in the water supply line between the flush valve and the toilet bowl. With respect to these valves the Board of Appeals found: "Each of these valves had a hollow chamber divided by a transverse slitted diaphragm into an inlet and an outlet chamber. In the inlet chamber there was a hollow ball acting as a back flow check valve. The slitted hemispherical diaphragm also acted as a check valve. One of these valves was later modified by boring holes beneath the rubber diaphragm valve and inserting therein copper tubes which were soldered in place. The inner ends of these tubes were so located that when the hemispherical diaphragm opened, the ends of the tubes would be sealed, but when the diaphragm valve closed, air would be admitted below the diaphragm valve. *The Examiner of Interferences has held that this structure, which has been identified in this record as Exhibit 5, satisfies the terms of the counts."* (Italics supplied).

Thereafter Groeniger improved his valve. The improvement consisted in enlarging the air inlet ports. A new model was constructed in December, 1932. (Exhbit 9) Another model was built in October, 1934. (Exhibit 15) These two valves although much alike differed in that the later one had a metallic baffle plate in the centre of the valve chamber. The Board of Appeals affirmed the Examiner of Interferences and found: "It appears, therefore, that as early as May, 1932 [1930] appellant [Groeniger] had constructed a device which satisfies the terms of the counts, and this was followed up by the construction of improved forms of the valve late in 1932 and late in 1934. These dates do not appear to be questioned."

Both tribunals of the Patent Office found that Groeniger had embodied his invention in physical form in May, 1930, December, 1932, and October, 1934. Were these embodiments tested to determine satisfactory performance? The Patent Office held that they were not but this court finds that they were.

Groeniger combined two old and well known structures, a rubber teat valve and a valve body having air inlet ports so arranged that when water flowed through the valve the teat valve would close off the air inlet ports. The teat valve was old. Its operation was well understood by Groeniger through his experience as a journeyman plumber. The use of air to dissipate a vacuum and to prevent syphonage, and water-closet flushing devices and closet bowls provided with air intake ports to prevent back syphonage, were all known to Groeniger.

It was also well known to the art that the total cross section of the air passages must be at least equal to the cross section of the supply pipe coupling of the flush valve. With this personal knowledge and practical experience in the art in which he was working Groeniger, after reducing his invention to a physical embodiment, wanted to learn whether it would operate satisfactorily and whether the teat valve would have a long life in actual use.

After the completion of the first embodiment of the invention in May, 1930, Groeniger placed the valve on a rack to test the diaphragm in an open and closed position. He testified in open court as to the satisfactory character of the test:

"A. Exhibit No. 5 was made by the Beaton & Cadwell Manufacturing Company, from drawings furnished by myself of what we know as air-in-but-no-air-and-no-water-out valve. It is a valve also which dissipated vacuum by automatically opening when the air is below atmosphere in line. This valve was taken by myself in 1930, two openings were drilled in the side of it, two tubes of approximately 3/16 of an inch pipe size were placed in each side of it, for the purpose of determining whether the test valve would close off while water was passing through the valve. These tests were made in my laboratory in the basement of my house in Columbus. These tests were continued over a period of some four years, to determine the life of the rubber in service. Tests were made intermittently over that period. The water was flushed through at every opportunity, in order that the teat valve itself would be active over that period.

"Our determination was that we could seat, the valve would seat and close the openings when water was passing through it, and that they, the openings would open

again after the water had passed through it, the same as any of the teat valves that were formerly employed in that class of work..

"Q.81. How did you know that when water pressure was applied to this physical Exhibit No. 5, that the parts of the teat valve would open up and close the air openings? A. There was no leak of water shown through the air openings.

"Q.82. So, then, as I understand it, you attached Exhibit No. 5 to suitable piping? A. Exhibit 5 was attached to piping, and pipe was conducted from there to the waste opening in the sink below. We had a valve at the top connected by a pipe, and a tube running down to the waste.

"Q.83. And to what was the upper pipe connected to? A. It was connected to the City Water Supply.

"Q.84. At what pressure? A. Approximately 75 pounds.

"Q.85. About what time was this original test, this beginning test, made of Exhibit No. 5? A. They were made in 1930, —Fall of 1930, to be exact.

"Q.86. And under those conditions of water pressure on, passing through the teat valve, opening it up, as you said, and closing the air openings, no water came through the air tubes? A. No. sir."

In 1932 Groeniger developed an improved form of his self-policing air valve embodying the principles of Exhibit 5 rearranged to make the valve simpler to manufacture. This valve (Exhibit 9) was made by Wolverine Brass Company from Groeniger drawing number 706 dated June 1, 1932. Exhibit 9 was immediately placed under test by Groeniger. He testified in open court:

"Q.159. Mr. Groeniger, did you make any tests with physical Exhibit No. 9? A. Yes, sir.

"Q.160. Will you please state what tests you made? A. Physical Exhibit No. 9 was tested first and primarily with air for vacuum purposes. It was designed for a vacuum and naturally the primary test of any vacuum breaker would be for a vacuum. The term 'vacuum breaker' of course would mean that it would have to break a vacuum, so that the first primary test that we would make would be a vacuum test.

"Q.161. And when did you make a test with Exhibit 9 under vacuum conditions? A. Almost immediately upon receiving it from the Wolverine Brass Company.

"Q.162. And about what time was that? A. It was in, according to their letter, it was around December 8 or 9, 1932.

"Q.163. And how long were those tests carried out? A. The tests on this valve were carried out over a period until this was—about from that date on—attached to a closet and flushometer valve connected to a closet bowl.

"Q.164. What type of test was that? A. The type was both for vacuum and for the diaphragm ability—ability of the diaphragm to stand up under tests, because of the fact that the Wolverine Brass Company, who have a great many devices and have a great deal of knowledge of rubber and its application to valves and other things, suggested that we have a rubber with linen lining; that would increase its strength, and we were experimenting with various kinds of material in order that when the article went out in commercial service we would be sure that we would employ the best type that we could; so that vacuum tests with the application of water passing through the water-closet and also the application of the vacuum test was applied on many, many different occasions.

"Q.165. Mr. Groeniger, will you state approximately how many tests you made under vacuum conditions before you received in 1932 the physical Exhibit 9 that you have in your hand? A. Well, I say we really made hundreds of tests, both in my several laboratories, the last one at 478 West Fifth Avenue,—we made them in hospital buildings; if necessary, I can name them; using the columns and water in the hospitals to test sterilizers—both instrument sterilizers and bed-pan sterilizers, and with various kinds of sterilizers and material that they use in hospitals, both in Columbus and Cleveland. Many tests were made in private buildings, using the column of water of the riser itself to produce the vacuum.

"Q.166. Did you have, at the time you received physical Exhibit 9, any test apparatus at your home? A. My first test, of course, was made in a plant on Michigan Avenue in Columbus, Ohio. We moved from that to an office building, and then I moved the apparatus to a large light basement room of my home, where it was my personally hobby, and hours were spent in testing.

"Q.167. At the time you received the physical Exhibit 9, did you have any ap-

paratus for testing at your own home? A. Yes, sir.

"Q.168. Did you test with the apparatus for vacuum at your own home, that physical Exhibit No. 9? A. Yes, sir."

Edward Groeniger, the patentee's son, testified before the Patent Office: "* * * the data found from the test of this model [Exhibit 5] was used in the design of a drawing I made in 1932". This 1932 drawing was the Groeniger drawing No. 706 (plaintiff's Exhibit 8) from which the valve in evidence as Groeniger Exhibit 9 was made. It is apparent therefore, that if Edward Groeniger used the data derived from testing Exhibit 5 in his preparation of the drawing, he must have been fully conversant with the testing of Exhibit 5 and that such testing must have been satisfactory.

Further circumstantial corroboration that the Groeniger physical embodiments were tested under vacuum is afforded by the inclusion of an aspirator as an essential part of the testing apparatus installed in the Groeniger laboratory during the testing period. The testing apparatus was identified by Groeniger's son Jack who testified in open court that he observed his father use the test apparatus "hundreds of times".

The oral testimony respecting tests is supplemented and corroborated by an elaborate display of the physical equipment taken from the basement of Groeniger's home in Columbus, Ohio and by numerous photographs, blueprints and drawings. Furthermore, convincing tests were repeated in open court during the trial.

The Groeniger invention was not of a check valve alone nor of an airbreak device alone. It is admitted that these elements were old in the art. Groeniger combined these old and well understood devices in such manner that they would cooperate during their normal operation to produce a new and useful result. The Groeniger invention contains two elements each of which is individually capable of preventing back flow of water. If the teat valve fail, the Groeniger valve would nevertheless be effective because the air ports would admit air to break any vacuum which might be present in the supply line. What is new is the cooperation of the check valve and the air intake ports of the Groeniger device. This new feature was tested with successful results.

Defendant has attempted to introduce his own test requirements by asserting that un-less a device was capable of coping with a vacuum of fifteen inches of mercury or more the device would be unsuccessful and would not constitute a reduction to practice. There is nothing in the interference counts which calls for any degree of vacuum. The extent of testing which the defendant seeks to impose upon plaintiffs is not legally requisite to establish reduction to practice.

November 14, 1934, Groeniger left with his patent attorney drawings and models for the purpose of preparing patent applications. This work was carried forward with diligence. Groeniger made frequent trips from Columbus, Ohio, to New York City in connection with the work. This was one of a group of eight applications in vacuum breaker cases. In the instant case the application was filed June 7, 1935. This was not an unusual time to expend in the preparation of an application to the Patent Office.

Our patent laws are for the protection and encouragement of exploring minds, not only of the well equipped and well-to-do but also of the humble who devise novel structures as the result of concentration on their daily tasks. Groeniger's laboratory was in the cellar of his home. He did not have a staff of research engineers. His testing equipment may have been crude from the standpoint of a trained research engineer.

Both tribunals of the Patent Office found that Exhibits 5, 9 and 17 satisfied the terms of the counts in issue. It clearly appears that Exhibit 5 constituted a full and complete reduction to practice of that invention conceived at least three years before the earliest date claimed by Yoder as his date of conception.

There remains the question of double patenting. The defendant asserts that claim 1 of Groeniger's patent No. 2,092,757 is the same as count 1 of the Interference and that claim 2 of Groeniger's patent No. 2,033,467 is the same as count 2 of the Interference. The defense of double patenting was not pleaded in the answer and therefore need not be dealt with. Even though it were pleaded the record establishes that plaintiffs are not barred from obtaining the counts in issue corresponding with claims 4 and 10 of the Groeniger application Serial No. 25,476 because of double patenting.

The new evidence before this court is sufficient in character and amount to carry thorough conviction that the Patent Of-

fice erred in awarding priority to Yoder. This was well illustrated in the demonstrations before the court with the Groeniger test apparatus.

A decree will be entered awarding priority to Groeniger and authorizing the Commissioner of Patents to allow the two claims in controversy in Groeniger's application.

This opinion contains a statement of the essential facts and of the law applicable thereto in conformity with Rule 52 of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c.