MINNESOTA MIN. & MFG. CO. et al. v. CARBORUNDUM CO.

SAME v. CARBORUNDUM CO. et al.

Civil Actions Nos. 273, 252.

District Court, D. Delaware.

March 23, 1945.

Harold J. Kinney, of St. Paul, Minn., and John Pearce Cann, of Wilmington, Del., for plaintiffs.

George E. Stebbins, Walter J. Blenko, and William H. Webb, all of Pittsburgh, Pa., and Arthur G. Connolly, of Wilmington, Del., for defendants.

LEAHY, District Judge.

Minnesota Mining & Manufacturing Company et al., v. Carborundum Company, Civil Action No. 273, was consolidated for trial with Minnesota Mining & Manufacturing Company et al., v. Carborundum Company and E. I. DuPont de Nemours & Company, Civil Action No. 252.

I

In deciding Plaintiffs v. Carborundum, the court's findings of fact and conclusions of law, pursuant to Rule 52(a) of the Rules of Civil Procedure, 28 U.S.C.A. following § 723c, are

1. This suit was brought under R.S. § 4915 as amended, 35 U.S.C.A. § 63, by plaintiff Byron J. Oakes and by plaintiff Minnesota Mining & Manufacturing Company, assignee of said Oakes Application Serial No. 558,872, filed on August 24, 1931, and Serial No. 222,490, filed on August 1, 1938, as a continuation-in-part of the first application. Suit is brought to determine a question of priority of claims found in a patent of Norman P. Robie, No. 2,111,006, granted March 15, 1938, on an application filed December 10, 1936; the same is a continuation-in-part of an earlier Robie application, Serial No. 746,849, filed October 4, 1934. Robie patent is assigned to defendant The Carborundum Company. Claims 1 to 10 inclusive of said Robie patent were originally in suit. These are the same as counts 1 to 10 of an interference in the Patent Office designated as Oakes v. Robie, Interference No. 76,371, declared October 13, 1938. At a pre-trial conference called by this court on May 15, 1944, it was agreed that counts 7, 8 and 9 would be dropped and our attention would be restricted to counts 1 to 6 inclusive and count 10, corresponding with claims 1 to 6 inclusive and 10 respectively, of said Robie patent. The claims involved in the trial were, therefore, the following:

"Count 1. An abrasive article comprising abrasive grains and a solidified binder comprising a polymerized vinyl compound containing sufficient hydroxyl groups to be self-dispersible in water.

"Count 2. An abrasive article comprising abrasive grains and a solidified binder comprising the reaction product of a hardening agent with a polymerized vinyl compound containing sufficient hydroxyl groups to be self-dispersible in water.

"Count 3. A bonded abrasive article comprising abrasive grains bonded into a unitary article with a binder comprising a polymerized vinyl compound containing sufficient hydroxyl groups to be self-dispersible in water.

"Count 4. A coated abrasive article comprising a backing material and a layer of abrasive grains attached thereto by a binder comprising a polymerized vinyl compound containing sufficient hydroxyl groups to be self-dispersible in water.

"Count 5. A coated abrasive article comprising a backing material and a layer of abrasive grains attached thereto by a binder comprising polyvinyl alcohol.

"Count 6. A coated abrasive article comprising a backing material and a layer of abrasive grains attached thereto by a binder comprising a partially hydrolized polyvinyl compound."

"Count 10. A flexible abrasive article comprising a flexible base, abrasive grains, and a bond for securing said abrasive grains to said base, said bond comprising polyvinyl alcohol and a plasticizer therefor."

2. Article claims are involved and are directed to a type of abrasive article, such as so-called sandpaper, wherein the abrasive grains are bonded together and, where backing is specified, are also bonded to the backing by a polymerized vinyl compound. Abrasive articles or sandpaper with other types of adhesive binders were known to the art. But no one prior to Oakes and Robie had made abrasive articles or sandpaper having as a binder the polymerized vinyl compounds mentioned in the claims in suit.

3. The claims are substantially similar, although there are some differences in their scope.

Claim 5 calls specifically for polyvinyl alcohol as the binder for the abrasive grains in a coated abrasive article or sandpaper. Count 10 is similar to count 5, except that it additionally specifies a plasticizer. Count 4 is similar to count 5 in that it specifies that the binder comprises

a polymerized vinyl compound containing several hydroxyl groups to be self-dispersible in water, e. g., polyvinyl alcohol is such a material. Count 6 is similar to count 4 in that it specifies that the binder comprises "a partially hydrolized polyvinyl compound"; polyvinyl alcohol is a hydrolized polyvinyl acetate. Commercial polyvinyl alcohol (90%) is, "a partially hydrolized polyvinyl compound". Counts 1 and 3 are somewhat similar to count 4 in the definition of polyvinyl compound used as a binder; but unlike counts 4 and 5, it is not recited as a backing material. Count 2 is different from count 5. It calls for an abrasive article, e. g., sandpaper, in which the binder for the abrasive grains is specified as the reaction product of a hardening agent with polyvinyl alcohol or its equivalent.

The Robie patent states that "$Cl_2$, $Br_2$ and sulphur or other hardening or insolubilizing agents" may be utilized, with the result that the adhesive binder of count 2 may be polyvinyl chloride, polyvinyl bromide, or other vinyl materials derived from polyvinyl alcohol or its equivalent, e. g., polyvinyl acetate, polyvinyl acetals, etc.

■ 4. Robie's earliest date was February 6, 1934, which is approximately two and one-half years after the filing date of Oakes. Oakes Serial No. 222,490 was filed after Robie, but filed as a continuation-in-part of Oakes' parent application Serial No. 558,872, and is entitled to the benefit of the first filing date and has priority on the record as to the subject matter of any of the claims disclosed in Oakes' first application.

5. Oakes' application is directed to abrasive articles of the coated abrasive or sandpaper type and to the use of polyvinyl compounds, for example, vinyl resins, as a binder or bonding adhesive for the abrasive grits. Oakes entitled his application "Vinyl Resin Adhesive Sandpaper". His application discloses various specific polymerized vinyl compounds, either by name or by formula, as binders for abrasive articles, such as the sandpaper type. The polymerized vinyl compounds differ from each other in the substituent groups which occur in each; as for example, in the polyvinyl chloride the substituent group is chlorine (Cl), in polyvinyl acetate the substituent is the acetate ($C_2H_3O_2$ group), in polyvinyl alcohol the substituent group is the hydroxyl group, i. e., the "OH"

group. The substituent groups differentiate the polymerized vinyl compounds one from the other, polyvinyl alcohol being analogous in its chemical formula to polyvinyl chloride, except that it contains the "OH" group instead of the "Cl" or chlorine group. Similarly, polyvinyl alcohol $(CH_2=CH.OH)_n$ is similar in its chemical formula to polyvinyl acetate $(CH_2=CH.C_2H_3O_2)_n$, except that it contains the "OH" group instead of the acetate group. Of the three illustrative vinyl polymers just mentioned, polyvinyl chloride is the most resistant to water and polyvinyl acetate and polyvinyl alcohol are less resistant.

6. Among the substituent groups in the vinyl compounds which are disclosed in the said Oakes' application, the hydroxyl group, i. e., the "OH" group, is disclosed on p. 5, 1. 10 of the parent application. At the trial de novo, new evidence was adduced which convinces the court that Oakes' parent application Serial No. 558,872, and particularly p. 5, 1. 10, discloses, to the man having a knowledge of chemistry and skilled in the art, polyvinyl alcohol as a binder or adhesive bond for abrasive grits in sandpaper manufacture. To that man the parent application not only discloses the subject matter of claim 5, but also the somewhat broader claims found in claims 1, 3 and 4. As commercial varieties of polyvinyl alcohol are seldom in the pure state, but are customarily a partially hydrolized polyvinyl acetate (a content of polyvinyl alcohol of the order of 90%) on the basis of the teaching or the rule in the parent application, it discloses to our man skilled in the art the subject matter of count 6 at p. 7; linseed oil is disclosed as well as other materials, as a plasticizer or softener for the various polymerized vinyl compounds disclosed, including polyvinyl alcohol. Taken with p. 5, this makes disclosure to our man the subject matter of claim 10. The parent application, p. 5, for example, in the formula on p. 6, discloses the use of a polymer of vinyl chloride as a binder for abrasive articles. The application also discloses polyvinyl bromide for such use. Likewise it discloses the polymer of vinyl acetate. The polymerized vinyl chloride and polymerized vinyl bromide are among the materials contemplated in the Robie patent, where the reaction of chlorine and bromine with polyvinyl alcohol is disclosed as a suitable method of producing an abrasive

article wherein the binder is hardened in respect to water, i. e., is made resistant to or insoluble in water. We conclude Oakes discloses to our man—the one skilled in the art—the article called for in claim 2.

7. Polyvinyl alcohol, including the other polymerized vinyl compounds here involved, were known prior to the filing of Oakes' parent application. Witness Esselin tells us, however, that the literature in respect to these compounds is recent.

■ 8. In the Interference No. 76,371 the Examiner of Interferences decided adversely to plaintiff, and on the record before him was affirmed by the Board of Appeals. While the testimony of one of defendant's witnesses, Dr. Esselin, might be said to indicate that he did not agree with the ratio of the Examiner of Interferences, he nevertheless agreed with his conclusion. Each of plaintiffs' witnesses regarded p. 5 of Oakes' parent application as making disclosure of polyvinyl alcohol as a binder for sandpaper. On review, the Board of Appeals commented on the failure of Oakes to teach how polymerized vinyl alcohol might be produced and stated that Robie had disclosed definite procedure for preparing polyvinyl alcohol. Polyvinyl alcohol per se was known before the early filing of Oakes on August 24, 1931, and much longer before the original filing of Robie. Repetition of an old procedure for making a known material was unnecessary to be included in Oakes' parent application.

9. Persuasive weight of the evidence is that polyvinyl alcohol may properly be denominated as a synthetic resin; or more specifically defined, it may be recognized as a vinyl resin. Several of the expert witnesses, including Dr. Whitmore, Dr. Colburn, Dr. Dyer and Dr. Lynch, testified that they examined a pertinent excerpt from p. 5 of Oakes' application before they were advised of the issues, the parties involved in this suit, or the existence of this suit itself. They independently came to the conclusion that the disclosure of the hydroxyl group at p. 5 of Oakes' parent application and the context in which it occurs provides to the man skilled in the art a clear and unmistakable disclosure of polyvinyl alcohol.

Conclusions of law are

1. The evidence introduced at the trial of this case at bar in character and amount carries thorough conviction that there should be reversal; and the evidence satisfies requirements as established by Morgan v. Daniels, 153 U.S. 120, 14 S.Ct. 772, 38 L.Ed. 657. The evidence adduced, which is new over that considered by the Patent Office, satisfies plaintiffs' burden of proof. All witnesses who testified in this case qualified as persons skilled in the art. This new evidence was proper.

■ 2. The test of the adequacy of disclosures in a patent application is the meaning it has to the man skilled in the art. What it means to an ordinary layman or to an administrative officer not particularly skilled in the particular art is not, as a matter of law, a satisfactory test. Terminology of patents and patent applications should be interpreted by the test we have just mentioned.

3. Plaintiff Oakes, assignor to Minnesota Mining & Manufacturing Company, is the first original and lawful inventor of the invention defined in claims 1 to 6 inclusive and 10; and said Minnesota Mining & Manufacturing Company, as assignee, is entitled to receive a patent for the invention specified in said claims.

4. The complaint should be dismissed as to counts 7, 8 and 9, in conformity with the order entered in the pre-trial conference.

II.

In deciding Plaintiffs v. Carborundum and DuPont, the court's findings in this companion case are:

1. Suit is brought under R.S. § 4915, 35 U.S.C.A. § 63, growing out of Oakes-Paulson Interference No. 78,175, instituted on April 12, 1940, and by the Oakes application Serial No. 330,882, filed February 26, 1940, as a continuation-in-part of the Oakes' parent application Serial ·No. 558,-872, filed October 24, 1931 and Paul M. Paulson reissue patent No. 211,272, granted March 15, 1938, on an application filed August 18, 1936, based on a final decision of the Board of Interference Examiners adverse to plaintiffs. Title to Oakes' application is in plaintiff Minnesota Mining & Manufacturing Company, as assignee. Legal title to said Paulson patent is in defendant E. I. DuPont de Nemours & Company, with a substantial interest therein owned by defendant Carborundum Company.

2. The claims involved in the trial were 1 and 2 of the Paulson patent; and are

the same as counts 1 and 2 in Oakes-Paulson Interference No. 78,175.

3. Plaintiffs rely upon Oakes' parent application for disclosure of the subject matter covered by claims 1 and 2. They read:

"Claim 1. A flexible article comprising a flexible base, abrasive grains, and a bond for securing said abrasive grains to said base, said bond comprising polyvinyl alcohol and an insolubilizing agent therefor.

"Claim 2. A flexible abrasive article comprising a flexible base, abrasive grains, and a bond for securing said abrasive grains to said base, said bond comprising polyvinyl alcohol, and a plasticizer and an insolubilizing agent therefor."

Claim 1 is very similar in scope and provisions to claim 2 of Robie patent No. 2,111,006, supra, considered at the trial and involved in Civil Action No. 273, supra. Claim 1 of Paulson, like claim 2 of the Robie patent, is addressed to an abrasive article characterized in that binder or bond for the abrasive grits comprises polyvinyl alcohol and an insolubilizing agent therefor. Insolubilizing agents disclosed on page 2 of the Paulson patent include some of the same hardening or insolubilizing agents disclosed on page 1 and elsewhere in the Robie patent. Claim 1 here involved, like claim 2 of Robie, is an article claim and is not limited to any particular method of manufacturing the article, and the claim is not limited as to where the adhesive or bonding material which is called for may be made or compounded, or whether it should be made before or during the sandpaper making operation. Among the hardening or insolubilizing agents for polyvinyl alcohol, as is apparent from the Robie patent, and as is also generally indicated by the Paulson patent, are agents such as chlorine, bromine, formaldehyde and others. Thus claim 1 here involved, i. e., claim 1 of the Paulson patent, calls for sandpaper in which the bond may be polyvinyl chloride, polyvinyl bromide, polyvinyl acetal, polyvinyl acetate, etc. The parent Oakes application, Serial No. 558,872, clearly discloses an abrasive article having a flexible base, abrasive grains, and a bond for securing the abrasive grains to the base, which bond may be polyvinyl chloride,

polyvinyl bromide, polyvinyl acetate, or various other vinyl compounds. Parent Oakes application also discloses the use of polyvinyl alcohol as a binder or bonding adhesive for abrasive grains in making a flexible abrasive article and discloses for use therewith such materials as linseed oil. Linseed oil is water-insoluble and would normally tend to protect polyvinyl alcohol from attack by water.

Claim 2 here involved is similar to claim 1 but additionally calls for a plasticizer. The parent Oakes application, as above stated, discloses polyvinyl chloride, polyvinyl bromide, polyvinyl acetate and other polymerized vinyl compounds as a binder or bonding adhesive for abrasive grains and also discloses linseed oil and other plasticizers or softening agents for such polymerized vinyl compounds. Parent Oakes application discloses subject matter of claim 2, as well as claim 1, here involved.

4. The final decision in the Patent Office on the Oakes vs. Paulson Interference No. 78,175 was rendered by the Board of Interference Examiners.* Defendants' witness Esselin indicated he did not agree with all the reasoning of the Board of Interference Examiners, but he indicated he agreed with their conclusion. The Board of Interference Examiners apparently did not interpret claim 1 here involved as being directed to sandpaper having as a binder or bonding adhesive for the abrasive grains such materials as polyvinyl chloride, polyvinyl acetate, polyvinyl acetal, or the like. Just what scope the Board of Interference Examiners gave to these claims is not clear from its decision, except that it apparently interpreted these article claims as though they contained process limitations. This court does not find in either of these claims any provisions which constitute actual process limitations.

5. Plaintiffs presented considerable new evidence, in addition to the pertinent parts in the record of proceedings before the Patent Office, which pertinently bears on the meaning appropriately to be given to these claims.

6. Each of the two claims here involved reads upon the disclosure of the parent Oakes application Serial No. 558,-

* It was an Interference under the new law and practice; the Board of Appeals did not pass on the question of priority or review the decision of the Interference Examiners. See n. 3, infra.

872, which was filed earlier than the filing date of Paulson and also earlier than the earliest date alleged in the preliminary statement of Paulson.

The law conclusions are:

1. The conclusions of law 1 and 2 in Civil Action 273, supra, are incorporated herein.

2. Plaintiff Oakes is the first original and lawful inventor of the invention defined in claims 1 and 2 here involved; and the Minnesota Mining & Manufacturing Company, as assignee, is entitled to receive a patent for the invention specified in said claims.

### Memorandum

■ Both actions grew from two interferences in the Patent Office and were consolidated for trial after pre-trial conference concluded such expediency.[1] The questions for decision rest, partly, upon this episode, viz., the filing date of parent Oakes application on August 24, 1931, was earlier than the original filing dates of Robie and Paulson, is earlier than the earliest dates of conception alleged in the latter's first statements, with the result that, if a decision is made that defendants' claims are readable upon the disclosures in Oakes' parent application, the award results in plaintiffs' favor. It is irrelevant to consider differences between Oakes' parent application and his 1938 and 1940 applications. The issue is restricted to whether Oakes' parent 1931 application supports his claims. Oakes claims to be the first inventor of sandpaper bonded with polyvinyl acetate, polyvinyl chloride, polyvinyl bromide, etc., and polyvinyl alcohol.[2] Oakes was experimenting, prior to his 1931 application, with vinyl resins as a bond for sandpaper; and he actually did make PVA at that time. Preliminarily, we hold neither the Board of Interference Examiners nor the Board of Appeals should have been interested in whether any of plaintiffs' claims required a disclosure of the method of producing PVA.[3] There was no requirement to reach a conclusion respecting the production of this intricate chemical substance because the point of this case is not whether any of the parties ever made PVA; the present invention is concerned with the use of a vinyl resin as a bond for sandpaper.

■ 1. The narrow issue is whether p. 5 of Oakes' parent application makes a disclosure of PVA, i. e., a polyvinyl compound containing sufficient hydroxyl groups to be self-dispersible in water and usable as a bond for sandpaper. Other issues are substantially similar and will be decided by the determination of the issue posited.[4] This being so, the issues of law[5] drop from the case. What we have, at bottom, is a fact question.[6] While the decisions of the Patent Office are decisions of an adminis-

---

[1] The actions are based on 35 U.S.C.A. §§ 52 and 63.

[2] Referred to herein as "PVA".

[3] R.S. § 4904 was amended to substitute a Board of Interference Examiners for the primary Examiner, eliminating recourse to the Board of Appeals. On the same day, R.S. § 4915 was similarly amended. Oakes-Robie Interference No. 76,371 arises under the statutes prior to the amendments; Oakes-Paulson No. 78,175 arises under the statutes as changed by the amendments.

[4] Other issues in Oakes v. Robie, C.A. 273 here, are involved—

(a) Count 10. In addition to the issues noted respecting Counts 1, 3, 4, 5 and 6, is there disclosure of a plasticizer (for example, linseed oil) for use with polyvinyl alcohol? Cf. p. 7 of Oakes parent.

(b) Count 2. If polyvinyl alcohol qua polyvinyl alcohol is not directly involved, is the binder for the bonded abrasive "the reaction product of a hardening agent with" polyvinyl alcohol so that the claim calls not for polyvinyl alcohol but a reaction product derivable from such alcohol by reaction with, for example, chlorine or bromine?

Similar issues in Oakes v. Paulson, C. A. 252 here, to Oakes v. Robie, supra, are involved—

(a) Count 1. Does Count 2 in Robie involve the same issue? Cf. p. 1, c. 2 of the Robie patent.

(b) Count 2. Does Count 1 in Robie involve the same issue, except that it includes a plasticizer as does Count 10 of Robie?

[5] As urged by counsel:

(a) Does the new evidence convince that Oakes was prior to Robie and Paulson? This is, in essence, still a fact question.

(b) Did the Board of Appeals in Oakes v. Robie err in holding Oakes had the "burden of proof beyond a reasonable doubt" even though Oakes enjoyed in his parent application a prior filing date over both Robie and Paulson?

[6] During the trial and after counsel had recited the history of the inter-

trative agency dealing with technical issues, and are entitled to great weight, Morgan v. Daniels, 153 U.S. 120, 14 S.Ct. 772, 38 L.Ed. 657; Smith v. Carter Carburetor Corporation, 3 Cir., 130 F.2d 555; Abbott v. Coe, 71 App.D.C. 195, 109 F.2d 449; and the decisions of fact questions by the administrative experts, made after painstaking analysis, must be honored, United States Industrial Chemicals, Inc. v. Carbide & Carbon Chemical Corporation, 315 U.S. 668, 678, 62 S.Ct. 839, 86 L.Ed. 1105, as the case at bar brings the matter before us de novo there is no justification for judgment for defendant simply because the administrative agency has so decreed; and the argument that the full equivalent of the new evidence adduced before us was available to plaintiffs while the interferences were pending before the Patent Office is manifestly not pertinent. Accordingly, we reject defendants' argument that plaintiffs had opportunity to present to the Patent Office all the new evidence adduced in the trial of the case at bar, and that plaintiffs, having elected to withhold that evidence, they are thereby precluded from an award under R.S. § 4915. Strong reliance is had on Barrett Co. v. Koppers Co., 3 Cir., 22 F.2d 395. That case is clearly distinguishable. There, during the taking of testimony in the Patent Office, questions were asked concerning commercial practices which the plaintiff directed his witnesses not to answer; and it was this evidence which was attempted to be brought forward for the first time in the subsequent R.S. § 4915 proceeding. R.S. § 4915 specifically provides that the trial before the district court will be "without prejudice, however, to the right of the parties to take further testimony." This court has had occasion to consider whether the Barrett case, supra, changed the general law as to the type of evidence which should be considered in an R.S. § 4915 proceeding. In Westinghouse Electric & Mfg. Co. v. Radio Corporation of America, 3 Cir., 24 F.Supp. 933, 939, it was said:

"The new evidence before this court is in large part the additional evidence called for by the board. It removes doubt as to what was the knowledge of the art in 1923. It corrected the mistakes into which the board fell through lack of familiarity with the art.

"The new evidence is sufficient to carry thorough conviction that the patent office erred in awarding priority to Round. This is not evidence suppressed or deliberately withheld from the patent office but new evidence necessitated by the decisions in the patent office. Plaintiff has thus met the burden by introducing new evidence different from anything that was before the patent office and which carries thorough conviction that the patent office erred in denying Zworykin the award of priority. Morgan v. Daniels, 153 U.S. 120, 14 S.Ct. 772, 38 L.Ed. 657; American Tri-Ergon Corporation v. General Talking Pictures Corporation, D.C., 8 F.Supp. 108, 121." [7]

All the comments which we have read on the Barrett case are in agreement that it simply stands for the proposition that when there is an extreme situation, as there existed, the deliberate withholding of evidence from the Patent Office on a relevant issue, during the taking of depositions for presentation to the Patent Office, may not later be presented to the trial court in an R.S. § 4915 action, for to do so would be to attempt to ambush the Patent Office officials. This is simply another application of the doctrine of estoppel. That doctrine has no application to the case at bar.

■ Defendants' other reliance is on R.S. § 4888, 35 U.S.C.A. § 33, which compels a patentee to make disclosure of his invention "in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains

ferences and the decisions of the Patent Office, the following occurred:

"The Court: And were those decisions the result of a finding of fact or is that a question of law as to what his application disclosed? (Oakes parent application being referred to by the language "his application")

"Mr. Blenko: I regard that as a finding of fact. Applications are addressed to men skilled in the art. The question

is, what does it mean to a man skilled in the art?

"The Court: What does it mean to the experts who have testified in this trial?

"Mr. Blenko: Yes, and what does it mean to the experts in the Patent Office?"

7 See also, John B. Pierce Foundation v. Penberthy Injector Co., D.C.Del., 38 F.Supp. 144.

* * * to make * * * and use the same." Both the old and new evidence is directed to what meaning should be given to that portion. of Oakes' parent application beginning at the end of p. 4 and extending through 1. 10 on p. 5. This portion reads:

"In general, it is contemplated by my invention to provide an abrasive article in the nature of sandpaper, including a filler, sealing, backing or sizing, impregnating or binder coats of a polymerization or resinified product of the organic compounds characterized by the ethylene linkage, such as the aliphatic organic compounds, characterized by an ethylene linkage or the aromatic substituted aliphatic organic compounds including an ethylene linkage, of which vinyl compounds, styrols, crotonylenes may be cited as examples.

"These polymerized products may include the following:—

"Vinyl chloride $CH_2=CHC$, vinyl acetate $CH_2=CH(C_2H_3O_2)$; B-chlor-prophylene $CH_2=CCI.CH_3$; styrene $\bigcirc\text{-}CH=CH_2$ the above allowing the following general description:

"RCH=CH-R the polymerized product having the general formula $(RCH=CH-R)_n$; R being either hydrogen, hydroxyl, or any organic radical * * *."

The primary question is whether the quoted language conveys a meaning to the man skilled in the art. Is there a disclosure to *him* of "hydroxyl" in Oakes' statement? And that man is called upon to answer the question as to whether the formula $(RCH=CH-R)_n$ may disclose both hydrogen and hydroxyl groups. If "R" may be substituted by the hydrogen and by the hydroxyl groups, then the resultant $(HCH=CH-OH)_n$ is admittedly the PVA formula. But, defendants insist, such interpretation is erroneous because Oakes should have made a semantic distinction between the two "R's", viz., by showing the first as $R_1$ and the other as $R_2$.[8]

Both plaintiffs and defendants called chemical experts to testify at length as to what Oakes had or had not failed to disclose. One group, for plaintiff, testified there was manifest disclosure by Oakes of PVA. The other group, for defendant, insisted that Oakes' statements were unintelligible and uncommunicative, and from this defendants argue that Oakes' general formula envisaging a myriad of permutations and combinations was, at most, a referent to a · genus and did not make a disclosure of a species, i. e., PVA. In short, the evidence adduced by those skilled in the art was in conflict. Under such circumstances, how does the nisi prius court resolve the conflict? Where do we seek the substantial guarantee of trustworthiness in weighing such. evidence adduced by conflicting experts, each of whom undoubtedly expresses his honest conviction, without guile but with strict attention to preserve his own sense of scientific integrity?

2. In such a situation we must examine $fact_1$ and $fact_2$, etc. Plaintiffs' contention that Oakes' parent application disclosed PVA is supported by the testimony of Dr. Byron J. Oakes, the applicant, Dr. Allan P. Colburn, Professor of Chemical Engineering and head of the Division of Chemical Engineering at the University of Delaware, Dr. Charles L. Mantell, a consulting chemical engineer from New York City, Dr. Elizabeth Dyer of the chemistry department of the Women's College of the University of Delaware, Dr. Cecil C. Lynch, Assistant Professor of Chemistry, University of Delaware, and Dr. Gustave E. Landt, President of the Philadelphia Textile Finishers of Philadelphia, and also special lecturer in plastics at the University of Delaware, and the deposition of Dr. Walter M. Lauer, Professor of Chemistry at the University of Minnesota, and the deposition of Dr. Frank C. Whitmore, Dean of the College of Chemistry and Physics, Pennsylvania State College. Plaintiffs designed utilization of the new evidence so that their experts reached their conclusions as to the meaning to be given to the 1931 application before they knew there was any litigation or had any idea about what answer would support plaintiffs' contentions. The plan was this— plaintiffs' witnesses were to have no knowledge of what plaintiffs were interested in. They were not asked why they believed Oakes' parent 1931 application disclosed PVA; they were asked, in fact, simply what his application disclosed.[9]

---

[8] For modern teaching on non-Aristotelian specificity see the interesting discussions in "Science and Sanity", 2nd Ed., A. Korzybski; "Language Habits in Human Affairs", I. J. Lee; "Language In Action", S. I. Hayakawa.

[9] Plaintiffs' utilization of experts is illustrated by a part of the direct exam-

Defendants adduced the testimony of Dr. Gustavos J. Esselin, a Consulting Chemical Engineer of Boston, and Dr. Ernest Hamlin Huntress, a Professor of Organic Chemistry at Massachusetts Institute of Technology. It is clear from the testimony that both collaborated in preparing a set of definitions, to be followed by both of them, after knowing what position defendants intended to take at the trial; but there can be no question that both these gentlemen at all times impressed the court by their scrupulous honesty in their discussions of the scientific questions involved. ·

Dr. Oakes testified why he first utilized the formula $(RCH{=}CH{-}R)_n$ on p. 5 of his parent application. Plaintiffs' brief elaborates this fact by stating:

"In this connection Dr. Oakes shows the conventional way to write the polymers of styrene, vinyl chloride, and vinyl acetate, all mentioned in the first half of page 5 of his parent specification, as well as the polymer of vinyl alcohol, here directly involved. He first shows the formula,

$$(RCH{=}CH{-}R)_n$$

then he showed that the conventional way to write the polymer of styrene is

$$(\bigcirc{-}CH{=}CH_2)_n$$

He also showed that the usual way to write the polymer of vinyl chloride is

$$(CH_2{=}CHCl)_n$$

The polymer of vinyl acetate, analogous to the polymer of vinyl chloride is conventionally written

$$(CH_2{=}CHAc)_n$$

The witness Oakes pointed out that polyvinyl alcohol is conventionally written

$$(CH_2{=}CHOH)_n$$

"That is, as Dr. Oakes stated, it was conventional to show the replaceable group in the case of polystyrene at the left end

---

ination of Dr. Dyer. The following portion of her testimony is not without significance:

"Q. Miss Dyer, the matter here in question involves the interpretation of certain language in an Oakes application. Will wou tell us very briefly whether you had this question put to you before you knew what answer the Plaintiff was interested in? A. The question was put to me definitely as a matter of meaning from the formula as it was presented to me before I had any knowledge as to the connection of the case as to its legal implications. It was put to me as an organic chemist.

"Q. Did you see a copy of letter dated May 25, 1944, addressed to Dr. Allen P. Colburn, which has been marked as Plaintiffs' Exhibit 9? A. Yes, I did see a copy of that letter of May 25, 1944, to Dr. Colburn.

"Q. What conclusion did you come to with respect to the language quoted in that letter as to the meaning to be derived from that language, in view of the disclosure of hydroxyl in the context in which it was there given? A. The conclusion I came to was that the hydroxyl in the context in which it is in that sentence could mean only polyvinyl alcohol.

"By the Court:

"Q. Did you arrive at that conclusion before you had any discussions with Dr. Colburn? A. Yes, Dr. Colburn brought this to me as a question of organic chemistry only. In fact, he gave me only the paragraph including the statement of the formula in the context in which it is.

"Q. Now, Miss Dyer, I call your attention to a certified copy of Oakes application Serial No. · 558,872, which has been marked in evidence as Plaintiffs' Exhibit 3, and I call your attention to page 5 of this application. You will note that this application is entitled "Vinyl Resin Adhesive Sandpaper", and if you will look at the language in that specification beginning in line 10, I think that you will see that it checks with the language quoted in that letter to Dr. Colburn, which is Plaintiffs' Exhibit 9, except that there was a typographical error in that letter to Dr. Colburn omitting the conclusion of a parenthesis. Will you check briefly and see if otherwise there is accord in the language? A. Otherwise the letter and the application are identical.

"Q. Now, I want to ask you the question again, applying it to this application—if I may take the letter—and ask you what the language on page 5 of this application, and particularly the disclosure of the hydroxyl group in line 10 of page 5, in the context in which it is employed, conveys to you. A. Hydroxyl always means an alcohol group, if you have hydroxyl by itself. The patent is dealing with vinyl resins. You would normally expect, therefore, a vinyl group. You are given the suggestion of hydroxyl, which means alcohol. Therefore, vinyl alcohol is not only the most reasonable, but the only substance which one would think of with this particular language.

"Q. When you say 'vinyl alcohol'—A. Polyvinyl alcohol, I meant. I am talking about the polymer of vinyl alcohol."

718

of the molecule, and in the case of poly-vinyl chloride and polyvinyl acetate it was conventional to show the replaceable group at the right end of the molecule. Therefore, to make his general formula in line 10 appropriately include his polystyrene, as well as his polyvinyl chloride and polyvinyl acetate, he showed an R at each end of the molecule, the R at the left end to be replaced by the benzene ring and the R at the right end to be replaced by hydrogen in the case of polystyrene and, vice versa, the R at the left end to be replaced by hydrogen and the R at the right end to be replaced by chlorine, acetate or hydroxyl in the case of polyvinyl chloride, polyvinyl acetate and polyvinyl alcohol, respectively. The testimony of defendants' witness, Dr. Esselin, in cross-examination corroborates the testimony of Oakes on the conventional way of writing these materials. Thus, the reason for the inventor, Dr. Oakes, having written his general formula the way he did in line 10 on page 5 of his parent application is apparent."[10]

The question of disclosure in Oakes' parent application was originally put to Whitmore in the abstract. His answer is pertinent:

"A. Well, your question was 'What compound or compounds do you think the inventor had in mind or intended to cover by his reference to "hydroxyl" in the above quoted passage?' And the only answer I could give to that was the polymer of vinyl alcohol."

Lauer testified, in part, as follows:

"Q. 48. * * * Have you read or looked through that application, Serial No. 558,872, Dr. Lauer? A. Yes.

"Q. 49. Did you find in it any disclosure of polyvinyl alcohol?

"Mr. Webb: I object to that on the ground it is leading.

"Mr. Kinney: My goodness, Mr. Webb, how could I ask a less leading question? That is the issue here.

"A. That is on page 5 and lines 10 and 11 '(RCH=CH-R)$_n$; R being either hydrogen, hydroxyl or any organic radical.' Now, if R represents hydrogen and hydroxyl, then, of course, one obtains polyvinyl alcohol.

"Q. 50. What was your answer to my question a moment ago, Dr. Lauer, about whether polyvinyl alcohol is disclosed in that application? A. My answer to that was yes.

"Q. 51. And where do you find that disclosure? I may be repeating. A. On page 5, beginning with line 10.

"Q. 52. How far along? A. And going down to half of line 11.

"Q. 53. And you are referring to page 5 of Oakes' application, Serial No. 558,872, which has been marked for identification as Plaintiffs' Exhibit C–3? A: Yes."

Colburn, another of plaintiffs' witnesses, testified that the question was put to him before he knew anything about the interest of the parties. He stated:

"As written I would suppose the inventor had in mind derivatives of vinyl alcohol. However, since vinyl alcohol has never been isolated it seems more likely that he had in mind derivatives of polyvinyl alcohol, which would lead one to believe that there should be another parenthesis in the formula as follows (RCH=CHR)$_n$."

Mantell stated:

"A. In my opinion, this application does contain a disclosure of polyvinyl alcohol."

Lynch said:

"A. Well, as a chemist looking at the statement of the polyvinyl compound, the word 'hydroxyl' would—oh, well, you couldn't help but assuming that they were referring to the common polyvinyl alcohol in the general formula. I think that is true of almost any chemist looking at the general formula and the word 'hydroxyl' following. That was my first reaction, and I am giving it that way.

*    *    *    *    *

"Q. When that language was first presented to you, did you know which answer either litigant in this case was interested in? A. Not at all."

And later in his testimony Lynch repeated:

"A. When I first looked at the general formula, I had to think about it, but then the word 'hydroxyl' was the thing which, of course, I had to substitute here,

---

[10] The chemical literature, including allied patents, shows it customary to use the same symbol "R" or "X" or a similar symbol, in the same general chemical formula to denote different radicals or substituent groups.

and the only compound that came to my mind from substituting 'hydroxyl' in the general formula was polyvinyl alcohol. Since considering it, I don't know anything else you would get if you substitute hydroxyl in there. It seemed the only reasonable compound and the only compound that could have been meant by an hydroxyl substitution applied in the polymer."

Defendants insist that the formula, appearing in the 1931 application, considered in the light of its context, does not "say" PVA to the skilled chemist. Admitting that the literature on PVA (especially circa 1931) was new and "it is not as accurate as it should be", Esselin, for defendant, nevertheless approached Oakes' parent application with technical nicety. He stated: "Now, inasmuch as vinyl alcohol does not exist in monomeric form, it hardly seems proper to include vinyl alcohol as one of the things that are supposed to be disclosed by Oakes." The word "polymerized" appears on p. 5 of Oakes' parent application. Esselin believed, therefore, that Oakes must have intended to produce his polymers directly from his monomers. He stated: "I should think that if material was polymerized, it would imply that it was polymerized from a monomer." When shown that one of defendants' patents (Robie) contained the same word, Esselin said: "I think it would have been preferable if he (Robie) had said a vinyl compound polymer." He finally admitted that the word "polymerized" was not confusing. This is shown by the following:

"Q. Now, in short, is your position, when you see the word 'polymerized' in the Oakes application different than when you see it in the Robie patent? A. No."

The court's difficulties were not lessened by the following:

"By the Court:

"Q. Well, Doctor, I can't follow that. If R can be either one of two things, why couldn't it be hydrogen at the beginning of the formula and some other organic radical at the other end? A. Because when you are writing a patent specification, where you want to indicate that R may be one of two things, you make one R an R and the second one either R' or an R₁ or you use some other letter, * * *".
especially as that difficulty remained a constant by reason of the following:

"Q. In writing the formulae of chemical molecules, the idea of using the same symbol to designate different actual substituent groups, such as the symbol R or X or Y or Z, going back say ten or fifteen years, you are familiar with lots of illustrations where the same letter is used at two or more points in the same molecule to denote different radicals? A. Yes."

Here is Whitmore's statement:

"XQ13. In order to arrive at a conclusion that the inventor Oakes had in mind poly vinyl alcohol it is necessary for you to substitute hydrogen for the one R and hydroxyl for the other R? A. That is what I did." * * *

"XQ31. Now, in the first paragraph of that patent you set forth a general or type formula, do you not there? A. Yes.

"XQ32. And the letters X and Y are both used in that formula? A. Yes.

"XQ33. And, as stated in the patent, 'Y indicates a hydrogen or halogen atom, and X indicates a halogen atom'. Is that correct? A. That is correct.

"XQ34. So that here again you drew a careful distinction between the two substituent groups that were to be embodied in that general formula? A. Not in this case because in this case the Y, as I recall the patent, can cover a case in which one Y is hydrogen and the other Y is a halogen, or in which both Y's are hydrogens or both Y's are halogens. So in this case I use the Y in the same general way that Oakes used R. You see this is not limited to Cl₂ or Br₂; it could be one chlorine or one bromine and one hydrogen."

Another facet of the testimony is not without interest. For example, Esselin testified that the term "resin" as used in the Oakes parent application would exclude polyvinyl alcohol. But we are required to recognize that PVA is described in "Handbook of Plastics" by Simmons and Ellis, p. 206, as a "resin". In addition, one defendant (DuPont), in an advertisement found in the "Plastics Catalog" described PVA as a resin.

Defendants conclude their argument by stating that the "plain English" of the pertinent passage found in Oakes' parent application *excludes* PVA; their counsel repeat "that is what the language *means*; no amount of testimony can change it." They sum up by saying Esselin's testimony "*commends* itself to the *disinterested* reader as a *full* and *fair* appraisal of the situation." We utilize italics to demonstrate

words may often lose all meaning. Following the teaching of Korzybski et al. (op. cit. n. 8., supra), it has been suggested where a definite number of chemical formulae may represent an infinite number of isolated substances, the chemist-expert has been taught to recognize the symbolic meaning of $X_1$ and $X_2$, etc., or $R_1$ and $R_2$, etc.; and his chemical dictionary is not that of Samuel Johnson or Noah Webster. But may it not be said that the chemist's research compels his words to be not only functional but mutable. Historical fact demonstrates confusion exists among the words of economists, psychiatrists, politicians, lawyers, statesmen and judges; but the words of science may also have a duality of meaning to the scientists skilled in the art. The case at bar proves this proposition. Unless this be so, there is urgent need to have a Supreme Court of Experts and a need to revamp the whole approach of interpretation of our patent system. In such situations, today, if we are required to accept defendants' views, the court needs not only the testimony of those skilled in the art, but it would appear we are required, in addition, to be something of, as Judge Dobie has suggested, a scientific semanticist.[11, 11a]

Invention here consists simply of sandpaper bonded either with or without PVA or with one of the other disclosed substances. After examination of the "scientific" testimony which was adduced in the cases at bar, the issue which emerges is simple: does Oakes' parent 1931 application mean to the scientist skilled in the art that PVA has been disclosed? On this issue the Dyer, Colburn, Lynch and Whitmore testimony obviously gives simple and direct answer. For them, as for the other of plaintiffs' experts, there is neither conjecture, semantic speculation, nor necessity for a priori reasoning. From their discussions, together with the other evidence, as well as the evidence adduced before the Patent Office, we conclude Oakes must be entitled to priority. As this was, in substance, a jury question, like the jury, we are not called upon to articulate our rejection of the expert "scientific" testimony adduced on behalf of defendants.

Let a decree be submitted.

---

[11] As was stated in Lever Bros. v. Procter & Gamble, 4 Cir., 139 F.2d 633, 640:

"We cannot expect in a soap-process patent (and it would be unreasonable to require) terms with the precise exactitude and the clear cut accuracy found in the nomenclature of pure mathematics. We are dealing with a practical, present field of industry, not with a visionary far-off Utopia. It would be, we think, altogether unreasonable to require strictly that Bodman describe his process only in words with a keen, razor-like connotation.

"Bodman may have lacked a full appreciation of 'beta' and 'omega' soaps; he may not have completely known, in all their devious ramifications, the theories of 'phase' and 'critical temperatures' of soaps. The words he used in describing his invention may not have invoked the unqualified praise of the scientific semanticist. But it is our considered opinion that he did develop a novel and important process for controlling the properties of soap by mechanical treatment rather than by chemical changes and formulae, that he was at least 'boldly empirical', and that he proclaimed his invention in such form and fashion that those skilled in the gentle soapmaking art would have little or no difficulty in either understanding his process or putting this process into practical effect."

[11a] The first judicial rejection of the Korzybski approach which we have been able to discover is that found in Judge Frank's dissenting opinion in Commissioner of Internal Revenue v. Shamberg's Estate, 2 Cir., 144 F.2d 998, 1008.